EQUAL EMPLOYMENT
OPPORTUNITY
COMMISSION

v.

SOUTHWESTERN BAPTIST
THEOLOGICAL
SEMINARY.

Civ. A. No. CA 4-77-141-E.

United States District Court,
N. D. Texas,
Fort Worth Division.

Jan. 18, 1980.

Abner W. Sibal, William L. Robinson, David W. Zugschwerdt, Charles David Nelson, Terrence Willingham, E. E. O. C., Washington, D. C., for plaintiff.

Jenkins Garrett, Steve M. King, Garrett & Stahala, Frank D. McCown, Fort Worth, Tex., for defendant.

MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

This action is brought by the Equal Employment Opportunity Commission ("EEOC") to establish jurisdiction over the defendant Southwestern Baptist Theological Seminary ("Seminary") under § 709(c) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; and specifically, to compel the Seminary to submit the Higher Education Staff Information Report ("EEO-6"). 29 C.F.R. § 1602. The Seminary admits that it is covered under the jurisdictional language of § 709(c) and the literal wording of EEOC regulations pertaining to educational institutions. 29 C.F.R. § 1602.47. However, the Seminary has refused to submit form EEO-6 for the years 1975 and 1977 contending that it is protected from enforcement of Title VII by the religious clauses of the first amendment to the Constitution of the United States.

Plaintiff denies that Title VII infringes on any first amendment rights and asserts further that the Seminary has submitted to the virtually identical enforcement procedures of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq., in seeking and maintaining its status as an approved program of education for veterans receiving educational benefits and has thereby waived its free exercise objections, if any, to enforcement of Title VII.

I. *Free Exercise*

The Southern Baptist Convention (the "Convention") is a voluntary association of Southern Baptist churches composed of representatives ("messengers") elected by cooperating churches. The convention is incorporated in the State of Georgia "for the purpose of eliciting, combining and directing the energies of the Baptist denomination of Christians for the propagation of the gospel." Defendant Southwestern Baptist Theological Seminary (the "Seminary") is an agency of the Convention located in Fort Worth, Tarrant County, Texas, and is organized as a Texas non-profit corporation for the specific purpose of training ministers for the Southern Baptist churches and missions.

The Seminary is exempt from income taxes and as an integrated auxiliary of an association of churches is not required to file the Form 990 information return. Sixty percent of the Seminary's funding comes from the Convention's missionary fund, 20%

from endowment, 20% from private contributions and student charges. In addition to its strictly educational facilities, the Seminary operates a cafeteria, a printshop, a bookstore and some off-campus student housing. These are conducted under various financial arrangements as student and/or administrative services and not as profit-making ventures.

Approximately 1,450 theological candidates, most of whom have other secular degrees, are enrolled in the Seminary pursuing degrees exclusively in theology, religious education, and church music. The Seminary's bylaws flatly prohibit the expansion of curriculum to provide strictly secular education. Enrollment is not open to the public or to Baptists in general but is limited to persons who have experienced a "divine call" to a specific role in the ministry or the church. Certain academic standards are imposed, but these are considered subordinate to moral and spiritual qualifications. A prospective student must persuade the Seminary not only of his own personal spiritual experience and commitment to a full-time Christian vocation but, if married, of his spouse's commitment as well. The local church must verify the student's, or couple's, divine call, character, and other qualifications.

Fulfillment of the academic requirements of a degree program does not automatically entitle the theological candidate to award of a degree. The faculty reserves the right to withhold a degree based on moral or spiritual deficiencies, and has exercised this right in the past. Upon graduation, the students are left to their own efforts, aided by divine providence, in locating the particular position of service they will occupy. The Seminary does not operate a placement service or an employment office to aid its graduates. Information is merely supplied to churches that request it.

It cannot be overemphasized that the Seminary views a pervasively religious environment as essential to the cultivation of the distinct attitudes and qualities of Baptist ministers and that this view dictates its employment practices as a whole. Employees are not merely hired to perform a task, but must from first to last be willing members of the ecclesia. Religious exercise is a virtual condition of employment. Brief devotional services open all staff meetings, and chapel services which employees as well as students are expected to attend are conducted each school day, Tuesday through Friday. The Seminary's employment practices are designed to create an integrated, homogeneous community exemplifying the mores and dogma of the Baptist faith and the quality of religious life achieved by its strictest application. Since all employees, whatever their position, are expected to contribute to a unified religious endeavor and maintain a commitment to spiritual life, religious discipline extends far into their personal lives, not merely to avoid the embarrassment of a notorious lifestyle, but to immerse the students in an atmosphere of intense piety and to provide a model of religious practice to the outside world.[1]

The significance of faculty and administrators in this scheme cannot be doubted. "The ministry" of the Baptist church spans a range of religious vocations which may be characterized as full-time Christian service in response to a divine call and includes lay leaders as well as ordained ministers. Lay leaders may "serve a ministry" as directors of religious education, or music directors of a local church, or as professionals attached to a foreign mission. Members of the faculty and administration of a seminary are considered ministers and are hired, assigned, advanced, tenured, evaluated and terminated on predominately religious criteria. Personal characteristics that evince

1. The Seminary employs 633 individuals, 189 in full-time and 433 in part-time positions. Of the 162 faculty members, 86 are full-time and 76 are part-time. The administrative staff consists of 15 full-time, permanent positions, including deans. There are 21 permanent, full-time support positions consisting of clerical, maintenance and medical staff. Sixty-seven temporary support positions are presently filled by spouses of students or faculty members. The 386 part-time support positions are occupied exclusively by students, student's spouses and faculty spouses.

dedication to Baptist ideals and faithful participation in the activities of the church of which the employee is a member carry equal or greater weight than academic qualifications or scholarship. Recruitment of faculty and administrators is viewed as a divinely guided "spiritual quest" mutually pursued by the Seminary and the prospective employee. No employment agencies, search organizations, or newspaper ads are utilized in seeking faculty or administrators. Membership in the Baptist church is a prerequisite to employment.

Support personnel likewise perform a bona fide religious and educational function. The Seminary hires students, students' spouses and faculty spouses in preference to outsiders. These employees comprise the great majority of the Seminary's support personnel and all of its part-time employees. This practice extends financial assistance to the students and helps to draw the students, the faculty and their families into a religious community.

Full-time, career support personnel have considerable contact with students and their families as supervisors and as providers of student services. Unlike faculty and administrators, they are not ministers in the formal sense by virtue of their employment at the Seminary. However, they are encouraged and expected to view their work as fulfillment of a religious calling. A significant number of them have theological degrees or have performed other full-time missionary work. Although membership in the Baptist Church is not a formal requirement for employment as support personnel, these employees must display an appreciation and enthusiasm for the evangelical principles of the Seminary as a Baptist institution. In the judgment of Dr. Russell Dilday, Jr., President of the Seminary, only a person from a very similar fundamentalist background could have acquired the sympathetic understanding to make them compatible with "the Seminary family." No degree of skill or expertise could override the conviction that a person occupying a support position evinced an attitude inconsistent with the ideals and religious responsibilities of the institution.

The issues presented in this case cannot be resolved by balancing the compelling interests of the state against the sanctity of irreconcilable religious belief, as in *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Although the Seminary recognizes certain doctrines that could require discrimination on the basis of sex in some faculty and administrative positions at some remote future date, its representatives deny the existence of any tenet of the Baptist faith that would require or justify discrimination solely on the basis of race or national origin as a matter of religious conviction. Nevertheless, it is clear that the Seminary intends to select and advance employees of every category on criteria that go beyond church affiliation and possession of basic training and skills. The Seminary regards its employment decisions as divinely guided assessments of each employee's suitability for the position he will occupy in relation to the students and as a representative of the institution, and seeks to assert its right to make these intensely subjective decisions without government supervision. The case presents a pure question of entanglement that cannot be obviated by statutory construction in the manner of *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), i. e., whether the religious exception contained in Title VII of the Civil Rights Act is adequate when applied to a seminary to assure the degree of separation between church and state required by the free exercise clause of the first amendment.

Jurisdiction under the literal language of Title VII is conceded. The Seminary admits that it employs more than 15 persons, that its activities affect interstate commerce, and that it is an educational institution granting degrees in college level instruction. 42 U.S.C. § 2000e; 29 C.F.R. § 1602.47. The Court will further assume that it is not an unlawful employment practice under Title VII, 42 U.S.C. § 2000e–2(e) for the Seminary to restrict its employment to persons of the Baptist denomination or of other closely related fundamentalist sects.

This Court is bound by the law announced in this circuit in *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972), *cert. denied* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1973), that Congress did not intend to exempt any religious organization, whether a church or a seminary, from liability for discriminating against its employees on the basis of race, sex, or national origin. The exemption presently afforded by Title VII, 42 U.S.C. § 2000e–1, is a remarkably clumsy accommodation of religious freedom with the compelling interests of the state, providing on the one hand far too broad a shield for the secular activities of religiously affiliated entities with not the remotest claim to first amendment protection while on the other hand permitting intrusions into wholly religious functions. *See McClure, supra; King's Garden, Inc. v. F. C. C.*, 162 U.S.App.D.C. 100, 104, 498 F.2d 51, 56 (D.C.Cir. 1974). The exemption covers only religious discrimination and is intended to suffice for a wide range of diverse religious entities from church supported hospitals, publishers of religious literature, and religiously affiliated colleges to the churches themselves, their seminaries and auxiliaries. It makes no accommodation for the entanglement that may result from the mere inquiry into the employment practices of an institution that comprises the very heart of religious propagation.

The risk of unseemly governmental entanglement increases exponentially as the function of an institution becomes more fundamentally and pervasively religious. The originative power of any religion lies in the institution that schools its ministers, preserving and transmitting dogma in a pure form in the academic sense and endeavoring to animate sterile doctrine into communicable faith. A seminary's function within a particular religion is to replenish the core of faithful who provide its structure, a role even more essential to its mission than that served by parochial elementary and secondary schools, e. g., *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 767, 93 S.Ct. 2955, 2962, 37 L.Ed.2d 948 (1973); *Brown v. Dade Christian Schools*, 556 F.2d 310 (5th Cir. 1977), and one qualitatively different than that of religiously affiliated colleges offering liberal arts or other secular courses of study to the public, *see* e. g., *Bob Jones University v. Johnson*, 396 F.Supp. 597 (D.S.C.1974) *affd. per curiam*, 529 F.2d 514 (4th Cir. 1975); *EEOC v. Mississippi College*, 451 F.Supp. 564 (S.D.Miss.1978) *appeal docketed*, No. 78–3123 (5th Cir. Sept. 27, 1978). The operation of a seminary is an ultimate religious activity entitled to the highest degree of first amendment protection.

Application of the provisions of Title VII to any aspect of the employment relationship existing between the Seminary and its faculty and administrators, by virtue of their status as ministers, infringes upon the free exercise clause of the first amendment. *McClure, supra; EEOC v. Mississippi College*, 451 F.Supp. 564 (S.D.Miss.1978) *appeal docketed*, No. 78–3123 (5th Cir. Sept. 27, 1978).

Application of the provisions of Title VII to any aspect of the peculiar employment relationship existing between the Seminary and its support personnel also infringes upon the free exercise clause of the first amendment. Although these employees are not ministers in the same formal sense as faculty, the Seminary has chosen not without cost to impose religious responsibilities on their role that go beyond objective employment duties and skills and beyond simple church membership. The Seminary will necessarily and rightfully discriminate among Baptists in selecting a zealous, orthodox, and spiritually compatible staff and in determining the terms and conditions of their employment. A school of divinity operated as an adjunct to a larger secular institution, sharing its physical space and utilizing its administrative services and personnel, would be hard pressed to convince this Court that the orthodoxy of its non-teaching staff was necessary to discipline its students in the daily

practice of a religious life. The Seminary, however, has attempted to create a virtually cloistral environment through manifest, institutional devices, of which its employment practices are an essential part. Its employment decisions, steeped in a perception of divine will and inseparable from its mission, become matters of religious prerogative and warrant the fullest protection from governmental supervision.[2] Enforcement of Title VII claims against a seminary based on race, sex, or national origin, even in the absence of articulated doctrinal compulsion, will lead inevitably to excessive governmental entanglement with religion in the process of dissecting employment functions into religious and secular components and in divining the good faith and legitimacy of religious grounds asserted as a defense to a prima facie case of discrimination. *Lemon v. Kurtzman*, 403 U.S. 602, 613, 615–16, 91 S.Ct. 2105, 2111, 2112–13, 29 L.Ed.2d 745 (1971); *McClure, supra; Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

II. *Waiver*

Plaintiff EEOC asserts that the Seminary has waived any first amendment objections to enforcement of Title VII by seeking approval of its course of study under the accreditation standards of the Veterans Administration, 38 C.F.R. § 18, and thereby subjecting itself to enforcement of similar prohibitions contained in Title VI of the same Act. 42 U.S.C. § 2000d. Surveillance of sectarian schools to the extent of assuring minimum educational standards, i. e., for accreditation purposes, has never been considered a major involvement amounting to entanglement. *Pierce v. Society of Sisters*, 286 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1931); *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). In fact, approval of the Seminary's program of education was expressly granted on the strength of the Seminary's accreditation by the American Association of Theological Schools and a routine examination of its catalogue under 38 U.S.C. § 1775(a). *Cf.* 38 U.S.C. § 1776. The Seminary is subject to periodic investigations conducted by the Texas Education Agency to assure that the institution is complying with recordkeeping requirements. These annual spot checks are conducted by representatives of the Veterans Administration and the Texas Education Agency and have consisted of random examinations of the grade sheets of enrolled veterans. In this respect the Seminary has not consented to any infringement of its religious exercise.

The Veterans Administration construes Title VI as applicable to any institution that it approves for enrollment of veterans receiving educational benefits, and accordingly requires compliance with Title VI as a condition to approval. *Bob Jones University v. Johnson*, 396 F.Supp. 597 (D.S.C.1974), *aff'd mem.*, 529 F.2d 514 (4th Cir. 1975) (held, University enrolling veterans is a "recipient of federal funds" under Title VI). Coverage under Title VI of the Civil Rights Act is independent of coverage under Title VII. Title VII applies generally to discrimination in employment by employers affecting interstate commerce, as defined in that title, regardless of whether or not they receive any federal funds. 42 U.S.C. § 2000e(b). Title VI forbids only discrimination by a recipient of federal funds against the participants in (or beneficiaries of) a federally assisted program conducted by the recipient, regardless of whether or not the participant or beneficiary is an employee. 42 U.S.C. § 2000d. Although the relationship between the recipient and the beneficiary may be that of employer/employee where the primary pur-

2. This holding would not permit the Seminary to enter into tangential commercial endeavors and claim the same shelter for those activities. However, where the positions sought to be exempted from Title VII are within the scope of functions ordinarily entailed in operating an educational institution it is entitled to treat these employees as part of its religious function.

pose of the federal program is to provide employment, Title VI would ordinarily apply only to those employees hired under the federally assisted program and not to the recipient's employment practices as to other employees. 42 U.S.C. § 2000d–3.[3] If Title VII also applies, it will do so by its own terms and not by virtue of the employer's status as a recipient of federal funds under Title VI. There is thus no statutory reason to treat Title VI as a separate avenue to coverage under Title VII.

The EEOC's argument seems primarily to be that the Seminary cannot submit to enforcement of regulations attached to a particular program in order to gain its benefits and then in good faith object on religious grounds to enforcement of identical or substantially similar regulations under a general welfare statute. This argument has some superficial appeal, but on examination is not supported by the law respecting grants-in-aid programs or by the facts of this case.

The United States has the power to fix the terms upon which federal assistance or subsidies will be awarded, *Oklahoma v. Civil Service Commission*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947), so long as those terms are themselves constitutional, *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). There is no authority for the proposition that acceptance of the terms attached to one grant subjects the recipient to regulation for all purposes or operates in and of itself to waive any immunity or privilege beyond that strictly conceded to obtain the particular grant.

Waivers of important constitutional rights must generally be knowing and intelligent and consents to their violation must be strictly construed. Since the Seminary has yet to experience any enforcement action, either private or administrative, and there is no evidence that any on-site compliance survey, routine spot check or investigation has been conducted under Title VI, the Court is unable to find any lack of good faith in the Seminary's assertion of religious objections to enforcement of Title VII. The regulation to which the Seminary is potentially subject under Title VI is not coextensive with or entirely similar to that under Title VII. The administrative sanction for violation of Title VI is withdrawal of Veterans Administration approval. Even in a private action for an isolated instance of discrimination, the institution is entitled to decline the aid rather than comply. Given the limited nature of the benefit accruing to the institution from enrollment of veterans, this ability to forego the federal assistance is not an unrealistic alternative.[4] In any event, enforcement of Title VI would be directed at preventing discrimination against veterans using their benefits to attend the Seminary. If the enforcement procedures necessary for this purpose invade religious freedom, they are confined within the boundaries of Title VI and do not reach the employment practices of the Seminary generally.[5] The Court according-

3. Title VI could apply to employees who are not themselves beneficiaries if discrimination against them has a discriminatory effect on the actual beneficiaries, e. g., where a school district's discriminatory policies in employment or assignment of teachers in the public school restricts the educational opportunities of the students. *United States v. Jefferson County Board of Education*, 372 F.2d 836, 881–883 (5th Cir. 1966) *cert. denied*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); 39 C.F.R. § 18.-3(d)(2).

4. With the exception of "reporting fees" received as reimbursement for administrative expenses incurred in meeting the reporting and recordkeeping requirements of the Veterans Administration, and the enrollment of less than 300 veterans receiving federal assistance, the Seminary is not the recipient of any funds or grants administered by any governmental agency, including the Department of Health, Education & Welfare.

5. By its holding of no waiver the Court avoids reaching the difficult constitutional questions posed by the prospect of a thorough vindication of Title VI as to candidates for the ministry attending various seminaries on veterans educational benefits. In the spirit of *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the Court notes the significant risk of infringement of the free exercise clause if Title VI is enforced to its statutory and judicial limits against seminaries, either by the Department of Health, Education

ly declines to hold that acceptance of veterans receiving federal assistance constitutes a waiver of religious objections to the more comprehensive and intrusive enforcement possible under Title VII.

Form EEOC–6 is designed for the purpose of monitoring compliance by educational institutions covered by Title VII and not for the purpose of determining entitlement to an exemption from that Act. Defendant Seminary, therefore, cannot be required to complete and return such forms.

Plaintiff's action is accordingly DISMISSED.

& Welfare on behalf of the Veterans Administration or by individual litigants asserting a private right under Title VI, *see Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); and a significant risk of establishment if the receipt of such federal funds by a seminary or a veteran's entitlement to educational benefits in pursuing the ministry is conditioned too directly on the content of the seminary's religious teachings or practice.