**Madeline RITTER**

v.

**MOUNT ST. MARY'S COLLEGE.**

**Civ. A. No. N–80–632.**

United States District Court,
D. Maryland.

Aug. 8, 1980.

---

James M. Kramon, Baltimore, Md., Dona S. Kahn and JoAnne Dellaverson, Philadelphia, Pa., for plaintiff.

Henry R. Lord and Neil J. Dilloff, Baltimore, Md., for defendant.

NORTHROP, Chief Judge.

Plaintiff, Madeline Ritter, a fifty-seven year-old Catholic, brought this action against the defendant, Mount Saint Mary's College (hereinafter the College), alleging sex and age discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Equal Pay Act of 1963, 29 U.S.C. § 206(d); and the Age Discrimination in Employment Act (hereinafter the ADEA), 29 U.S.C. §§ 621–634. The matter is presently before the Court on defendant's motion to dismiss the complaint under Rule 12(b)(1), (b)(2), and (b)(6) of the Federal Rules of Civil Procedure. A hearing on the motion was conducted before this Court on August 5, 1980. Because affidavits and other materials outside the complaint have been presented, the Court will treat the defendant's motion as a motion for summary judgment. Fed.R.Civ.P. 12(b).

Plaintiff was a lay faculty member at the College, which is the oldest private, independent Catholic institution of higher learning in the United States. The College's objectives are to provide a liberal arts education and a Catholic experience for its students. All undergraduate students are required to take at least fifteen semester credit hours in philosophy, ethics, and theol-

ogy prior to graduation. Students are encouraged to attend regular church services. Approximately 90% of the student body and 80% of the faculty are Catholic. In 1978, out of a total faculty of 76, there were 21 full-time priests and one nun on the faculty. Since its inception in 1808, the College has had a policy of recruiting and retaining qualified priests on its faculty. In an affidavit, the Chairman of the Board of Trustees of the College, the Rev. Msgr. Andrew J. McGowan, gave the following reasons for this policy:

> The reasons for the policy of recruiting and retaining qualified priests on the College faculty are many: priests provide a spiritual dimension to the College consistent with its history, tradition and mission; priests provide spiritual services and perform other clerical functions for which they receive no extra compensation; the College pays substantially less salary to priests and, accordingly, financial considerations militate in favor of employing priests over lay faculty; and priests are necessary to teach the required theology courses offered by the College.

*Affidavit of Rev. Msgr. Andrew J. McGowan in Support of Motion to Dismiss* at 2.

Plaintiff was considered for tenure in late 1978 along with four other faculty members, of which one was a priest—Father Vincent P. Malloy. On December 20, 1978, plaintiff was advised by the President of the College, Dr. Robert J. Wickenheiser, that she had been denied tenure. Two other lay faculty members were also denied tenure, and a tenure decision regarding the remaining lay faculty member had been postponed. Father Malloy was given tenure.[1] Plaintiff appealed her denial of tenure to the College's Board of Trustees,[2] which affirmed the President's decision. In late March 1979, plaintiff accepted a one-year terminal contract at the College, which

---

1. Father Malloy was subsequently appointed Vice President of the College.

2. The Board of Trustees acted through a quorum of its Executive Committee, of which a majority were clergy (including the Archbishop of Baltimore who serves on the Executive Committee *ex officio*). At that time, the By-Laws of the College required a majority of the Board to be composed of clergymen and specifically included the Archbishop of Baltimore.

expired in June 1980. After having apparently complied with the administrative prerequisites of Title VII, plaintiff filed this action in March 1980.

The College contends that 1) this Court lacks personal jurisdiction over the College; 2) this Court lacks subject matter jurisdiction over the case; and 3) the complaint fails to state a claim upon which relief may be granted. The College bases these contentions on the grounds that Title VII, the Equal Pay Act, and the ADEA do not express a clear, affirmative intention to include within their scope religious, non-profit, educational institutions such as the College. Assuming, *arguendo*, these statutes do express such an intention, the College submits that the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution prohibit this Court from considering the plaintiff's claims:

> The College's rights under the Establishment Clause would be violated because of excessive governmental entanglement into the College's internal decisionmaking and administrative affairs with respect to its faculty, including clergymen, and the policy of the College in seeking to retain qualified priests on its faculty. The College's rights of free exercise of its religious practices will be unconstitutionally burdened, *inter alia*, by the Court's review of (1) the granting of tenure to a priest, Reverend Malloy, as opposed to Mrs. Ritter, (2) clergy holding tenured positions in the faculty, (3) clergy holding administrative positions, (4) the tenure policies of the College as they may be influenced by consideration of clergymen eligible for tenure, and (5) faculty salaries of lay and clerical faculty.

*Motion to Dismiss* at 2–3.

The starting point for this Court's analysis must be *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), where the Supreme Court held that church-operated schools[3]

teaching both religious and secular subjects were not subject to the jurisdiction of the National Labor Relations Act. The Court stated that where the exercise of a federal regulatory statute over a religious institution raises serious first amendment questions, a court must first determine whether the statute provides jurisdiction over the institution. The test used to make this determination is whether there was a "clear expression of an affirmative intention of Congress" to include religious institutions within the scope of the statute. 440 U.S. at 504, 99 S.Ct. at 1320. In *Catholic Bishop*, the Supreme Court found "no consideration" by Congress of church-operated schools in either the Act or its legislative history. *Id.* The Court therefore excluded such schools from the jurisdiction of the Act.

■ Title VII prohibits an employer from discriminating against an employee on the basis of sex. 42 U.S.C. § 2000e–2(a)(1). Stressing the absence of any mention of religious institutions from the definition of "person" or "employer" in Title VII, 42 U.S.C. § 2000e(a) & (b), the College maintains there was no clear, affirmative intention of Congress to include religious institutions within the ambit of Title VII.

The courts which have construed the applicability of Title VII to religious institutions in light of *Catholic Bishop*, however, have concluded that Title VII does apply to religiously affiliated institutions. *Dolter v. Wahlert High School*, 483 F.Supp. 266 (N.D. Iowa 1980); *EEOC v. Pacific Press Publishing Ass'n*, 482 F.Supp. 1291 (N.D.Cal.1979). Section 702 of Title VII, 42 U.S.C. § 2000e–1 provides an exemption for religious organizations to discriminate on the basis of religion:

> This subchapter shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such cor-

---

**3.** Although the College is not "church-operated," its status as a religiously affiliated school suffices to invoke *Catholic Bishop* in analyzing this case. *See NLRB v. Ford Central High School*, 623 F.2d 818 (2d Cir. 1980).

poration, association, educational institution, or society of its activities.

Section 703 of Title VII, 42 U.S.C. § 2000e–2(e)(2) provides a similar exemption:

▉t shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

Unless this Court were to regard these statutes as mere surplusage, it is thus clear that Congress exempted religiously affiliated schools only from religious discrimination.[4] *Accord McClure v. Salvation Army*, 460 F.2d 553, 557–58 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972) (pre-*Catholic Bishop* analysis). The only case to the contrary, *EEOC v. Mississippi College*, 451 F.Supp. 564 (S.D.Miss.), *appeal docketed*, No. 78–3123 (5th Cir. Sept. 27, 1978), is less than persuasive in its reasoning. This Court therefore concludes that Congress has shown a clear, affirmative intention to include religiously affiliated schools within the scope of Title VII.

▉ Turning to the Equal Pay Act, 29 U.S.C. § 206(d)(1), this Court agrees with the defendant that under the *Catholic Bish-*

*op* test Congress did not demonstrate a clear, affirmative intention to include church-affiliated schools within the Act's jurisdiction. Plaintiff has not pointed to anything in the legislative history of the Act to indicate this intention. She does point to an exemption in the Fair Labor Standards Act, which governs the Equal Pay Act, contained at 29 U.S.C. § 213(a)(3). This exemption applies to "any employee employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or nonprofit educational conference center" operated on a seasonal basis. Plaintiff makes the superficially appealing argument that if Congress had intended to exempt all religious organizations from the ambit of the Equal Pay Act, there would have been no need to carve out an exception for this narrow type of religious organization.

This Court believes, however, that this statutory reference fails to meet the "clear, affirmative intention" requirement of *Catholic Bishop*. Although this Court employed a similar "surplusage" rationale in its analysis of Title VII, the sweeping language of 42 U.S.C. § 2000e–1 and the inclusive language of 42 U.S.C. § 2000e–2(e)(2) permitted such an interpretation. To translate the narrow, non-inclusive exemption contained in § 213(a)(3) into the broad proposition that Congress expressed a clear, affirmative intention to have the Equal Pay Act applied to religious institutions would do violence to the *Catholic Bishop* holding. While § 213(a)(3) certainly provides a *clue* to Congress' intent, it is far from conclusive.[5]

---

**4.** Had Congress intended to exempt religious organizations from other forms of discrimination, the United States Court of Appeals for the District of Columbia has noted in strong dicta that section 702 might be constitutionally infirm. *King's Garden, Inc. v. FCC*, 498 F.2d 51 (D.C.Cir.), *cert. denied*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974). *Cf. Catholic Bishop, supra* at 518 n.11, 99 S.Ct. at 1321 n.11 (Brennan, J., dissenting) (majority's construction of congressional intent raises establishment clause question).

**5.** Neither party has supplied the Court with any meaningful research on the legislative his-

tory of the Equal Pay Act of 1963 or the Fair Labor Standards Amendments of 1977 which created the exemption found at 29 U.S.C. § 213(a)(3). This Court's own examination of the congressional committee reports and debates of the Equal Pay Act of 1963, *see* H.R. Rep.No. 309, 88th Cong., 1st Sess., *reprinted in* [1963] U.S.Code Cong. & Admin.News, pp. 687, 687 *et seq;* S.Rep.No. 176, 88th Cong., 1st Sess. (1963); 109 Cong.Rec. 8892 & 8913–8917 (1963); 109 Cong.Rec. 9192–9218 & 9263 (1963); 109 Cong.Rec. 9761–9762 (1963), and the Fair Labor Standards Amendments of 1977, *see* H.R.Rep.No. 95–521, 95th Cong., 1st Sess., *reprinted in* [1977] U.S.Code Cong. & Admin.

Plaintiff insists that application of the Equal Pay Act to the College would not interfere with the College's religious mission but, rather, would only involve a mechanical comparison of faculty salaries. This argument is flawed. There is no suggestion in *Catholic Bishop* that the courts should engage in *ad hoc* determinations of whether a federal regulatory statute should apply to one bona fide religiously affiliated school while not applying to another.[6] Applying statutes on such a hodgepodge basis would lead to chaotic and inconsistent results. Inasmuch as clerics are paid lower salaries than lay faculty at the College, the threat of governmental intrusion into first amendment areas does not, at first blush, seem serious (although defendant has not yet addressed this point). The Court cannot, however, look at this one particular religiously affiliated school in isolation. Unquestionably, there are other such institutions that base their salary scales upon religious criteria. *See also* B. Schlei & P. Grossman, *Employment Discrimination Law*, at 218 (1976) ("[M]any religious institutions prefer members of their religion for all jobs, but will offer temporary employment, frequently at a lower rate of pay, to nonmembers when there are insufficient members interested in employment.").

The two cases plaintiff cites in support of her position are of no assistance. *Marshall v. Pacific Union Conference of Seventh-Day Adventists*, 14 Empl.Prac.Dec. ¶ 7806 (C.D. Cal.1977) was decided prior to *Catholic Bishop*. In dictum, *EEOC v. Pacific Press Publishing Ass'n*, 482 F.Supp. 1291, 1308 (N.D.Cal.1979) indicates its approval of *Pacific Union*, but it, too, contains no *Catholic Bishop* analysis. This Court must therefore conclude, under *Catholic Bishop*, that Congress did not demonstrate a clear, affirmative intention to include religiously affiliated schools within the sweep of the Equal Pay Act of 1963.

Applying *Catholic Bishop* to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634, this Court must also conclude that Congress did not express a clear, affirmative intention to include religious educational institutions under the ADEA. Plaintiff has not pointed to anything in the Act or its legislative history to indicate such an intention.[7] Instead, she urges this Court to construe the ADEA in conjunction with Title VII for "public policy reasons," citing *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979). *Oscar Mayer*, however, involved provisions of the ADEA and Title VII that are virtually *in haec verba*. There is no provision in the

News, pp. 3201, *et seq*; S.Rep.No. 95–440, 95th Cong., 1st Sess. (1977); H.R.Conf.Rep. No. 95–711, 95th Cong., 1st Sess. (1977); S.Conf. Rep.No. 95–497, 95th Cong., 1st Sess., *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 3201, 3254; 123 Cong.Rec. 29430–29484 (1977); 123 Cong.Rec. 32,893–32,909 (1977); 123 Cong.Rec. S17,252–S17,254 (daily ed. Oct. 19, 1977); 123 Cong.Rec. H11,327–H11,338 (daily ed. Oct. 20, 1977), uncovered no indication of any congressional consideration of religious institutions in general.

**6.** There is language in *Catholic Bishop* that might allow courts to draw distinctions between professional and non-professional employees of a religious institution. *See Catholic Bishop, supra*, at 501, 99 S.Ct. at 1319 ("critical and unique role of the teacher in fulfilling the mission of a church-operated school"); *EEOC v. Pacific Press Publishing Ass'n*, 482 F.Supp. 1291, 1302, 1310 & 1314 (N.D.Cal.1979). *Accord, Whitney v. Greater New York Corp. of Seventh-Day Adventists*, 401 F.Supp. 1363, 1368 (S.D.N.Y.1975); *NOW v. President and Board of Trustees of Santa Clara College*, 16 FEP Cases 1152, 1156 (N.D.Cal.1975); Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations*, 79 Colum.L.Rev. 1514, 1544–46 (1979). *EEOC v. Southwestern Baptist Theological Seminary*, 485 F.Supp. 255 (N.D.Tex.1980) represents a special situation due to the pervasively religious and virtually cloistral environment of the seminary.

**7.** Neither party has supplied the Court with any meaningful research on the legislative history of the ADEA. This Court's own examination of the congressional committee reports and debates on the ADEA revealed no indication of any congressional consideration of religious institutions. *See* H.R.Rep.No. 805, 90th Cong., 1st Sess., *reprinted in* [1967] U.S.Code Cong. & Admin.News, pp. 2213, *et seq*; S.Rep.No. 723, 90th Cong., 1st Sess. (1967); 113 Cong.Rec. 34,738–34,755 (1967); 113 Cong. Rec. 35,053–35,057 (1967); 113 Cong.Rec. 35,228–35,229 (1967); 113 Cong.Rec. 31,248–31,257 (1967).

ADEA similarly worded as 42 U.S.C. §§ 2000e–1 or 2000e–2(e)(2).[8]

■ Having determined that Title VII applies to religious institutions, the Court must now turn to the question of whether its exercise in this case would violate the guarantees of the Religion Clauses of the First Amendment.

In support of its motion, defendant maintains that examining its decision to deny plaintiff tenure would intrude into the College's religious activities. Specifically, the College argues that questioning its decision to grant tenure to a priest, Father Malloy, as opposed to plaintiff, infringes on the College's religious policy of granting tenure to qualified priests whenever possible. Plaintiff strenuously denies she is contending that Father Malloy was given tenure *instead of* her. She indicates there was no limitation on the number of tenured positions in late 1978. Because Father Malloy was in the Theology Department (where all faculty were, and are, priests), and plaintiff was in the Education Department, presumably they were not competing for the same teaching position. The question, plaintiff suggests, is not why Father Malloy was granted tenure *instead of* her, but why she was not *also* granted tenure.

Were this a case where a priest was granted tenure *instead of* a lay person because of the College's religious policy of promoting priests, such a decision could well be shielded from judicial scrutiny by the first amendment. Questioning this policy could result in excessive governmental entanglement, because it might "necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Catholic Bishop, supra* at 502, 99 S.Ct. at 1320. The record is unclear, however, as to whether such was the case here. There is nothing conclusive in the record verifying whether there was any limitation on the number of faculty who could be granted tenure. Although defense counsel indicated such a limitation at oral argument, he pointed to nothing in the record to support this contention.

Plaintiff does invite comparisons between herself and Father Malloy in her complaint of discrimination filed with the Maryland Commission on Human Relations, her charge filed with the Equal Employment Opportunity Commission, and her complaint in this case. *See Complaint* at 3 & 5; Exhibits A & B to *Defendant's Reply to Plaintiff's Memorandum in Opposition to Motion to Dismiss.* Despite these comparisons, nevertheless, the grounds for the denial of tenure are unclear.

*Roemer v. Board of Public Works of Maryland,* 387 F.Supp. 1282 (D.Md.1974) (three-judge panel), aff'd 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) involved the constitutionality of a Maryland statute providing annual, noncategorical grants to private colleges, among them religiously affiliated institutions. The College was a defendant in that case. A reading of the district court's Findings of Fact suggests that apart from the Theology Department, religion plays no part in faculty tenure decisions at Mount Saint Mary's College. *See* 387 F.Supp. at 1294. This finding was noted by the Supreme Court. *See* 426 U.S. at 757, 96 S.Ct. at 2350. Although the defendant has scurried to limit the applicability of the *Roemer* decision to this case, it does not dispute this finding.

If religion played no role in the decision not to grant plaintiff tenure,[9] then the Court fails to see how the application of Title VII to this case would violate the first amendment. *Cf. EEOC v. Southwestern Baptist Theological Seminary,* 485 F.Supp. 255, 258 (N.D.Tex.1980) (faculty tenured on

---

**8.** Although plaintiff has not made the argument, one might surmise that if Congress intended for Title VII to apply to religious institutions, it would also intend for the Equal Pay Act and the ADEA to apply likewise. Such *conjecture,* however, does not meet the exact-

ing standards of the *Catholic Bishop* "clear, affirmative intention" test.

**9.** On August 4, 1980, the defendant filed a Motion for Summary Judgment, which indicates that the College based its denial of tenure to plaintiff upon her professional qualifications.

predominantly religious criteria). In any event, genuine issues of material fact are apparent and summary judgment is thus inappropriate. *See NOW v. President and Board of Trustees of Santa Clara College*, 16 FEP Cases 1152, 1156 (N.D.Cal.1975) (motion to dismiss).

A separate order in conformance with these rulings will be entered.