F. Ray **MARSHALL**, Secretary of Labor, United States Dept. of Labor (Equal Employment Opportunity Commission, substituted in the place and stead of F. Ray Marshall, Secretary of Labor, etc.), Plaintiff-Appellee,

v.

**DALLAS INDEPENDENT SCHOOL DISTRICT, Defendant-Appellant.**

No. 77–2174.

United States Court of Appeals, Fifth Circuit.

Oct. 26, 1979.

Rehearing and Rehearing En Banc Denied Dec. 14, 1979.

Bowen L. Florsheim, Robert W. Smith, Charles W. Stuber, Lee Smith, Dallas, Tex., for defendant-appellant.

Kerry L. Adams, Beatrice Rosenberg, Asst. Gen. Counsel, EEOC, Washington, D. C., for plaintiff-appellee.

Before WISDOM, CLARK and GEE, Circuit Judges.

WISDOM, Circuit Judge:

This is a sex discrimination case involving the applicability of the equal pay provisions of the Fair Labor Standards Act, 29 U.S.C. § 206(d), to custodial employees of the defendant, Dallas Independent School District (DISD). After concluding that the Act was applicable, the district court enjoined DISD from committing future violations of the Act and from withholding back wages due female employees. The court directed DISD to pay back pay for the years 1972 through the date of the judgment, April 22, 1977, amounting to $1,065,495.70, plus accrued interest at the rate of 6 percent per annum. We reverse.

DISD, the eighth largest school district in the country, serving over 150,000 students, operates 182 public schools in Dallas, Texas. It has numerous facilities characteristic of a large school district. Before April 1, 1973, DISD divided custodial employees into "Custodial Helpers" and "Maids". At that time the classifications were renamed "Custodial Helper I" and "Custodial Helper II". Helpers I work for the entire twelve month calendar year while almost all Helpers II work during the nine month school year.[1] Before April 1, 1973, all female custodial employees were Maids.[2] From that date until June 1, 1975, 12 of the approximately 555 Helpers I were females. From January 1, 1972, until June 1, 1975, no men were employed as Maids or as Helpers II. Custodial Helpers/Helpers I have consistently been paid approximately 50 cents an hour more than Maids/Helpers II with equivalent seniority. The trial court held that this difference in pay was unjustified because both classifications were doing equal work within the meaning of the Act. This case involves 336 women employed as Helpers II since January 1, 1972, the period covered by the statute of limitations.

■ DISD argues that it is neither an "enterprise engaged in commerce or the production of goods for commerce" nor a single "establishment" within the meaning of the Act and that the two types of custodians do not perform equal work.[3] We find the first two contentions unmeritorious.

■ DISD stipulated that it regularly purchases goods that have moved in interstate commerce but contends that it is the "ultimate consumer" and therefore comes within the exception provided in § 3(i) of the Act.[4] The courts have rejected DISD's argument that it, rather than its students, is the consumer of the art supplies, paper towels, tissue paper, and other supplies it purchases. The district court properly held that a school's students (and a hospital's patients) are the ultimate consumers contemplated by the statute. *Brennan v. Indiana*, 7 Cir. 1975, 517 F.2d 1179, 1181–82, *vacated on other grounds*, 1976, 427 U.S. 909, 96 S.Ct. 3196, 49 L.Ed.2d 1202; *Brennan v. Iowa*, 8 Cir. 1973, 494 F.2d 100, 103–04, *cert. denied*, 1975, 421 U.S. 1015, 95 S.Ct. 2422, 44 L.Ed.2d 683. The decisions

---

1. A few Helpers II work at school district facilities during summer school sessions.

2. Whether women were denied the opportunity before 1973 to become Custodial Helpers is irrelevant for Equal Pay Act purposes so long as the two types of custodial jobs did not involve equal work. *See Hodgson v. Golden Isles Convalescent Homes*, 5 Cir. 1972, 468 F.2d 1256, 1258–59; *Hodgson v. Brookhaven General Hospital*, 5 Cir. 1970, 436 F.2d 719, 727. Of course, discrimination in hiring could violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. *See Diaz v. Pan American World Airways, Inc.*, 5 Cir. 1971, 442 F.2d 385, *cert. denied*, 1971, 404 U.S. 950, 92 S.Ct. 275,

30 L.Ed.2d 267. No such violation was charged here.

3. The school district also argues that the Equal Pay Act violates the Tenth and Eleventh Amendments. These contentions are without merit. *See Marshall v. A & M Consolidated Independent School Dist.*, 5th Cir. 1979, 605 F.2d 186; *Pearce v. Wichita County*, 5 Cir. 1979, 590 F.2d 128, 131–32.

4. Section 3(i) defines "goods" to exclude "goods after their delivery into the actual physical possession of the ultimate consumer thereof * * *" (29 U.S.C. § 203(i)).

concerning private enterprises are in accord. *See, e. g., Brennan v. Dillon*, 10 Cir. 1973, 483 F.2d 1334; *National Automatic Laundry and Cleaning Council v. Shultz*, D.C.Cir.1971, 143 U.S.App.D.C. 274, 443 F.2d 689.

■ The school district is a single establishment. All of the schools in the district are under the control of a central administrative office which in turn is controlled by a board of trustees. Duties of the principals in charge of the schools are prescribed by the central administration, and principals are directly accountable to the assistant superintendents and the general superintendent, who review their work annually and who may take appropriate action when their performance is found to be deficient. There is no difference in the general duties, power, and authority of the principals of elementary, junior high, and senior high schools. Delivery of custodial and maintenance service to all of DISD's schools is controlled by the office of the Superintendent for Support Services. The custodial job classification system is applied uniformly by DISD to all its facilities. Wages are set in a single wage agreement negotiated for all custodial employees, in which DISD established uniform salary schedules for Helpers I and II. All custodial and other salaries are paid by the central administration, and there is no differentiation in pay based upon the building in which the employees work. There is a general supervisor of the custodial division (Building Engineering) whose main responsibility is to employ and maintain the pool of custodial helpers for service in DISD's schools. Working out of the central administration's custodial office, this official hires, assigns, and transfers defendant's custodial employees as necessary. This office is also responsible for training and promoting custodial employees. The facts bring DISD squarely within our holding in *Brennan v. Goose Creek Consolidated Independent School Dist.*, 5 Cir. 1975, 519 F.2d 53, 56–58.

We turn now to the DISD's contention that the two classes of custodial employees do not perform equal work. The nature of the contention requires scrutiny of the transcript.

I

■ The trial court erred as a matter of law in comparing the work done by the two types of custodians during the nine month school year without considering work done by Helpers I during the summer and holidays when almost all Helpers II (Maids) are idle. During these vacations Helpers I and their custodial superiors strip wax from the floor of every room in the school where they work and rewax the floors. They do extensive yardwork during the summer, including removing refuse, mowing the lawn, cleaning flower beds, and trimming shrubs. Additionally, many Helpers I are employed on crews that travel from school to school performing maintenance and making repairs.

■ Although the trial court found that work performed by Helpers I during holidays and the summer was "not equal to work performed by custodial Helpers II", it disregarded this finding and instead compared work done during work weeks when both types of custodians were employed.[5] The court relied on the Fair Labor Standards Act, which uses a work week as its general standard for determining minimum

---

5. The trial court cited a district court case involving employees working for various periods. *Hodgson v. San Diego Unified School Dist.*, S.D.Cal.1973, 71 Lab.Cas. ¶ 32,920. In that case all male custodians were 12-month employees. The matron custodians, all of whom were women, worked as 10, 11, and 12-month employees. Although the court found that the school district had violated the Equal Pay Act, it did not discuss whether the difference in working periods affected the equality of the work performed. The case is also distinguishable because the duties of those custodians and matron custodians were similar. For example, the custodians did little outside work. Moreover, the 12-month matron custodians helped the custodians perform waxing and cleaning assignments during holidays and the summer. The 12-month matron custodians were paid at the same rate as the matron custodians who did not do this heavier work; the San Diego school district therefore could not argue that the higher salaries for custodians was due in part to their work during vacations.

wages and overtime pay due employees. The Equal Pay Act, however, makes no mention of work weeks. The regulations formulated by the Department of Labor state that the Act requires comparison of every aspect of a job:

> In applying the various tests of equality to the requirements for the performance of such jobs, it will generally be necessary to scrutinize the job as a whole and to look at the characteristics of the jobs being compared over a full work cycle. This will be true because the kinds of activities required to perform a given job and the amount of time devoted to such activities may vary from time to time.

29 C.F.R. § 800.120. While these regulations are not binding on the courts, they are entitled to great weight. *See Griggs v. Duke Power Co.,* 1971, 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158, 165; *Pearce v. Wichita County,* 5 Cir. 1979, 590 F.2d 128, 133 n.7.

The Equal Employment Opportunity Commission (EEOC) notes that Helpers I receive the same hourly pay year round and concludes that the difference between the salaries of Helpers I and Helpers II is not attributable to summer work. But an employer may decide to simplify its own budgetary problems as well as those of its employees and their families by paying a basic rate year round. Moreover, were the wage rate higher during the summer when the more difficult work is performed, many employees might work only during those months and then quit in favor of a job paying more than the nine month wage rate. Such seasonal fluctuations in the work force would make it difficult for a school district to make a realistic assessment of its personnel requirements. An employer should be forced to pay employees the same wages all year round to solve these problems. "Congress intended to permit employers wide discretion in evaluating work for pay purposes". *Hodgson v. Golden Isles Convalescent Homes, Inc.,* 5 Cir. 1972, 468 F.2d 1256, 1258.

## II

■ The trial court was clearly erroneous in finding that work performed by Helpers I and II during the nine month school year is equivalent. The record shows that the two classifications of employees have disparate responsibilities. Helpers I differ radically from Helpers II in terms of skill, effort, responsibility, and in their working conditions. A Helper I has a year-round, heavy custodial job. A Helper II works three months less than a Helper I in a job that may properly be described as light custodial work. Helpers II wash glass doors, clean water fountains, mop up spills in the lunchroom, wipe inside windows, and clean offices and girls restrooms. Both Helpers I and II clean classrooms, though the Helpers I usually clean a greater number. Helpers I clean the boys restrooms, mop the entire lunchroom floor, and clean each gymnasium and auditorium. In addition to these routine cleaning tasks, Helpers I perform other duties.[6] They labor outdoors mowing and watering lawns, picking up trash, hoeing flower beds in the fall and spring, and removing ice and snow from walkways during the winter. They use ladders, receive and store supplies, and carry out wet garbage. Although at times some of these extra tasks did not individually consume a significant amount of working hours for every Helper I, they assume importance when considered as a whole. Besides, as this Court noted in *Golden Isles,* Congress decided "a wage differential can be justified for employees who are available to perform an important differentiating task even though they do not spend large amounts of time at the task". 468 F.2d at 1258.

Testimony demonstrated the difference between the two classifications of custodial employees. Three of the four female Helpers I who appeared at the trial stated unequivocally that the jobs were not equiva-

---

**6.** A few Helpers II testified that on occasion (sometimes only once or twice during their employment) they performed one or more of the extra duties normally undertaken by Helpers I. Such occurrences were so rare as to be *de minimis.*

lent. For example, Jimmie Martin expressed her views in the following exchange

Q: From your experience of having done the job of custodial helper II and custodial helper I, are there any particular jobs that you do as custodial helper number I which requires [sic] substantially greater effort to do than the job that you did as custodial helper II?

A: Yes. All—just about all of it.

. . . . .

Q: Would it be, then, your opinion that the entire job of the custodial helper number I is substantially harder than the job of custodial helper number II?

A: That's right.

Catherine Berry gave a long list of Helper I tasks which required more work. When asked what aspects of her job as Helper I were more difficult than a Helper II position, Windolia Thomas replied: "All of it is hard. Everything I do now is harder."

The trial court found that "[o]ne female Helper I [presumably Inell Anderson] testified that the cleaning work of a Helper I was no harder than that performed by Helper II". The trial court erred in this finding. Ms. Anderson said only that the "community work" she did was no harder than the other Helper I work. Indeed, she had never been a Helper II and, when asked whether she knew what the Helpers II did at her school, replied, "Not all of it, I don't. I can't tell you that. I know some of it." She did testify that cleaning the boys restrooms was more difficult than cleaning the girls restrooms.

Other testimony also demonstrated the distinction between the two positions. For example, the plaintiff called sixteen Helpers II as witnesses. On cross-examination the defendant asked why they had not accepted the school district's 1973 offer to allow them to apply for a Helpers I position. All but one readily stated that the Helpers I had a harder job. The lone Helper II who testified that she did the same type of work as a Helper I later admitted that she did not use ladders and did not do yard work. Several custodians and many Helpers I testified at length about the differences between the two positions. DISD called two experts. One, an authority in manpower management, personnel administration, and job comparison analysis, found that the Helper I position "requires more responsibility, more skill and more effort". The other, a specialist in biomedical engineering, found a "significant difference" in the average calorie per day expenditure of the two jobs. Although the difference was less when summer and Christmas holiday work was excluded, the average difference in calories expended each day by Helpers I and II still totalled 166½ calories per worker. This figure does not include outdoor work done during the school year; inclusion of these tasks would make the disparity in calories expended by Helpers I and II even larger.

The EEOC has the burden of showing equal work. *Corning Glass Works v. Brennan,* 1974, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1, 10. This Court has formulated the following equality standard:

When Congress enacted the Equal Pay Act, it substituted the word "equal" for "comparable" to show that "the jobs involved should be virtually identical, that is, they would be very much alike or closely related to each other." The restrictions in the Act were meant "to apply only to jobs that are substantially identical or equal."

*Brennan v. City Stores, Inc.,* 5 Cir. 1973, 479 F.2d 235, 238; *accord, Hodgson v. Golden Isles Convalescent Homes, Inc.,* 5 Cir. 1972, 468 F.2d 1256, 1258. The legislative history supports this view.[7]

---

7. In *Angelo v. Bacharach Instrument Co.,* 3 Cir. 1977, 555 F.2d 1164, 1173, the Court, after an extensive review of the legislative history of the equal pay provisions, stated: "The legislative debates . . . manifest the congressional concern that the Act not be invoked to mandate equality of pay for jobs of different content." Representative Goodell (Rep. N.Y.), who sponsored the legislation, discussed the proper standard upon which jobs are to be compared: "I think it is important that we have clear legislative history at this point. . . .

We hold that the EEOC has not met its burden. The district court was clearly erroneous in finding that the work performed by Helpers I and Helpers II is equal within the meaning of the Equal Pay Act.

Our holding makes it unnecessary to discuss other issues raised in this appeal.

The judgment is REVERSED.

We went from 'comparable' to 'equal' meaning that the jobs involved should be virtually identical, that is, they would be very much alike or closely related to each other." 109 Cong.Rec. 9197 (1963). Representative Goodell explained that "equal job content" referred to " . . . jobs that involve the same quantity, the same size, the same number, where they do the same type of thing, with an identity to them". 109 Cong.Rec. 9209 (1963).