**Anne L. RUSSELL**

v.

**BELMONT COLLEGE et al.**

Civ. A. No. 81–3283.

United States District Court,
M.D. Tennessee,
Nashville Division.

Dec. 3, 1982.

---

Lionel R. Barrett, Jr. and William P. Redick, Jr., Nashville, Tenn., for plaintiff.

James P. Guenther, and R. Kreis White, Nashville, Tenn., for defendants.

## MEMORANDUM

JOHN T. NIXON, District Judge.

This is a sex discrimination case. The plaintiff, Dr. Anne L. Russell, alleges discriminatory discharge and discriminatory treatment on the basis of her sex in the compensation, terms, conditions and privileges of her employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Equal Pay Act of 1963, 29 U.S.C. § 206(d), amending the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, by the defendants Belmont College, Dr. Herbert Gabhart, President, Dr. J.M. Galloway, chairman, department of education, and Dr. Glen Kelley, academic dean. The plaintiff invokes this Court's jurisdiction under 28 U.S.C. § 1343. The plaintiff also alleges pendent jurisdiction over certain state claims—breach of contract, interference with employment contract, interference with prospective employment, invasion of privacy, outrageous conduct, defamation, conspiracy and negligence—and seeks declaratory and injunctive relief, reinstatement, and damages including back pay.

The case is before the Court on the defendants' motion for summary judgment under Fed.R.Civ.P. 56. The motion presents a novel issue concerning the applicability of the Equal Pay Act to a church-controlled college. The defendants seek dismissal of the plaintiff's Title VII claim because it was not timely filed with the Equal Employment Opportunity Commission (EEOC) and dismissal of the plaintiff's pendent state law claims for failure to state essential elements of the state claims. For the reasons stated below, the Court will grant in part and deny in part the defendants' motion for summary judgment.

### I.

The material facts of this case necessary for disposition of the defendants' motion are undisputed. Dr. Russell is a female citizen of the United States. She was em-

ployed from August 1979 until May 1980 as an assistant professor in the department of education at Belmont College. Belmont College is an educational institution created and controlled by the Tennessee Baptist Convention, which is an association of Southern Baptist Churches in the State of Tennessee. Many of the students and faculty members at Belmont College are members of the Baptist faith. Although Belmont College does not have a seminary or otherwise prepare students for the ministry, religious activities play an important role at Belmont College. For example, the 1979–1980 *Belmont College Bulletin* indicates that students are expected to attend a convocation during which a chapel service is conducted. If a student has a 20% absence rate from chapel services, then that student is on probation. A 25% absence rate from chapel services results in an automatic semester suspension. *Affidavit of R. Kreis White, Attachment A.*

The Tennessee Baptist Convention explains the purpose and function of Belmont College in "The Program of Christian Higher Education of Belmont College". *Affidavit of James P. Guenther, Attachment G.* The purpose of Belmont College as described by the Tennessee Baptist Convention is

To maintain a liberal-arts-centered, church-related institution, dedicated to education as a means of enhancing the student's appreciation of his cultural heritage, of increasing his effectiveness in assimilating and communicating ideas and facts, and of equipping him for citizenship in a free society. The college seeks to implement this purpose by maintaining standards essential to scholarship, by providing basic knowledge in the arts and sciences, by offering professional training in certain special areas, and by emphasizing the spiritual and intellectual qualities that are the mark of the Christian; and thus to develop mature individuals who will bring to their chosen careers ability and incentive to achieve intelligently and resourcefully, in accordance with Christian precepts.

The functions of Belmont College as described by the Tennessee Baptist Conven-

tion is to operate an accredited undergraduate school, to provide professional assistance to churches, businesses and individuals, to maintain adequate facilities for services rendered and for students, to recruit students and provide a well-rounded program of activities, to secure funds for the College, and to maintain good public relations. Noteworthy in the stated purpose and functions of Belmont College is the absence of any role to provide seminary training for students desiring to enter the ministry.

It is further undisputed that Dr. Russell entered a faculty contract with Belmont College on August 15, 1979 for the 1979–80 school year, which began in August 1979 and terminated in May 1980. *Affidavit of R. Kreis White, Attachment D.* That faculty contract provided a salary of $13,200 for Dr. Russell and specifically stated that:

"This is a one-year contract with no intent to continue beyond the 1979–80 school year".

On January 16, 1980, Mr. Glen E. Kelley, executive vice president, Belmont College wrote Dr. Russell concerning her employment with Belmont. He stated in his letter,

This is to make certain that there is no misunderstanding in regard to your status for the next academic year. As specified in the contract you signed on August 15, 1979, Belmont College will not offer you a faculty contract for the 1980–81 school year.

Thank you for your work at Belmont this year.

*Id. Attachment E.* Accordingly, Dr. Russell's employment with Belmont College terminated in May 1980.

## II.

The first question raised in the defendants' motion is the novel issue of whether the Equal Pay Act of 1963 (EPA) applies to Belmont College, a church-controlled educational institution. The defendants maintain that application of *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) requires this Court to conclude that the EPA does not

apply to Belmont College. In *Catholic Bishop,* the Supreme Court addressed the issue of whether lay teachers in schools labeled as "minor seminaries" [1] operated by the Catholic Bishop of Chicago are within the jurisdiction of the National Labor Relations Act (NLRA). The Court held that the NLRA did not apply to lay teachers in church operated schools.

In determining the scope of the NLRA in *Catholic Bishop,* the Court was guided by the general rule of statutory interpretation that: a statute will not be construed as violative of the Constitution if any other possible construction is available. *Id.* at 500, 99 S.Ct. at 1318. Recognizing the troublesome First Amendment questions raised if the NLRB had jurisdiction over lay teachers employed by the Catholic Bishop of Chicago, the Court formulated a test consistent with the general rule of statutory interpretation. As the Court explained, it must determine "whether the Board's exercise of its jurisdiction here would give rise to serious constitutional questions". *Id.* at 501, 99 S.Ct. at 1319. If so, the NLRA cannot be applied unless there is an "affirmative intention of Congress clearly expressed. *Id.*[2]

In this case, the defendants argue that neither the legislative history nor the terms of the Equal Pay Act evidence a clear affirmative intention by Congress that the Act should apply to church-controlled colleges. At least one federal district court agrees with the defendants' position. In *Ritter v. Mount St. Mary's College,* 495 F.Supp. 724 (D.Md.1980), the Court applied *Catholic Bishop* in a case involving Mount St. Mary's College, the "oldest private, independent Catholic institution of higher learning in the United States". *Id.* at 725.[3] At issue in *Ritter* was whether Mount St. Mary's College was required to comply with the Equal Pay Act as it relates to a lay female faculty member. The Court applied the *Catholic Bishop* clear affirmative intention test and concluded "that Congress did not demonstrate a clear, affirmative intention to include religiously affiliated schools within the sweep of the Equal Pay Act of 1963". *Id.* at 727–28 and n. 5. Of course, only the Supreme Court will be the final arbiter of this issue. For present purposes, however, this Court concludes for the reasons stated in Parts II and III of this Memorandum that the *Catholic Bishop* test does not apply, briefly those reasons are as follows.

First, the *Catholic Bishop* test does not apply because in determining the scope of the Equal Pay Act, this Court is guided by decades of judicial precedents interpreting the Fair Labor Standards Act of 1938 (FLSA). Given that the EPA merely amended the FLSA and given that the legislative history of the EPA incorporates the principles developed under the FLSA, it is

---

1. The schools involved in *Catholic Bishop* were the Quigley Schools operated by the Catholic Bishop of Chicago and a group of five schools operated by the Diocese of Fort Wayne-South Bend, Inc. The *Catholic Bishop* court explained that the schools operated by the Catholic Bishop of Chicago "are termed minor seminaries because of their role in educating high school students who may become priests". *N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. at 492, 99 S.Ct. at 1314. It is significant that the Quigley Schools provided special religious instructions not offered in other Catholic secondary schools to students recommended by their parish priests for priesthood or Christian leadership. Similarly, the schools operated by the Diocese of Fort Wayne-South Bend provided secular education "oriented to the Roman Catholic Faith; religious training is mandatory". *Id.* at 492–93, 99 S.Ct. at 1314–1315.

2. Mr. Justice Brennan joined by Justices White, Marshall and Blackmun aptly noted in dissent in *Catholic Bishop* that "those familar with the legislative process know that explicit expressions of congressional intent in such broadly inclusive statutes are not commonplace". *Id.* at 509, 99 S.Ct. at 1323.

3. Mount St. Mary's College provides a liberal arts education to its students and requires all students to take a minimum number of courses in philosophy, ethics and theology in order to graduate. *Ritter,* 495 F.Supp. at 725. Students are not required to attend church services but the College encourages attendance. The College deliberately seeks to hire Catholic Priests as faculty members to provide a "spiritual dimension" to the College, to provide spiritual services on campus and because the College can pay "substantially less salary to Priests". *Id.* at 725.

appropriate for this Court to apply rules of statutory interpretation arising out of the FLSA to determine the scope of the EPA. Moreover, the *Catholic Bishop* test resulted in church affiliated schools being exempt from the NLRA. The rule of statutory interpretation in *Catholic Bishop* exempting church affiliated schools may be contrary to the FLSA and EPA rule of narrowly construing exemptions from the Acts.

Second, *Catholic Bishop* does not apply because this Court cannot fairly construe the EPA to exclude the type of persons involved in this case. Without doubt, Belmont College is an "employer" for purposes of the FLSA and EPA. Without doubt, Belmont College as an institution of higher learning is probably an "enterprise engaged in commerce" for purposes of the FLSA. Without doubt, Dr. Russell as a college teacher is an "employee" for purposes of the EPA. Given these specific inclusions of Belmont College and Dr. Russell into the meaning of the EPA and FLSA, this Court will not perform some magical acts of statutory interpretation and ignore the clear and unmistakable provisions of the FLSA and the EPA.

Third, the *Catholic Bishop* test does not apply because of the factual dissimilarities of Belmont College and the schools in *Catholic Bishop*. Belmont College is for all practical purposes an ordinary undergraduate school which provides its students a strong religious atmosphere in which to learn. The schools in *Catholic Bishop* provided a religious atmosphere and seminary or required religious training. Belmont College does not have a similar requirement.

Fourth, the *Catholic Bishop* test does not apply because the interpretation of the Equal Pay Act adopted by this Court does not violate the Constitution. Consequently, the general rule of statutory interpreta-

tion—that a statute should not be construed as violative of the Constitution if any other interpretation exists—is satisfied in this case. This is possible because of the extremely narrow constitutional question presented. Having hired Dr. Russell, a lay female teacher, it certainly is not contrary to the Baptist faith to employ females. Indeed, the constitutional issue is exceedingly narrow: whether the First Amendment permits a church-controlled educational institution, such as Belmont College, having employed a lay female teacher, to discriminatorily compensate its employees on the basis of sex.

### A.

This Court's reference to judicial precedents under the Fair Labor Standards Act to construe the Equal Pay Act is supported by the rules and regulations of the Department of Labor concerning the EPA, 29 C.F.R. § 800 (1981) and by the legislative history of the Act. Recognizing that the Equal Pay Act merely amended the FLSA, the interpretive rules state that "the equal pay provisions neither extend nor curtail coverage of the Fair Labor Standards Act but simply place within the new requirements those employers and employees who were already subject to the Act's minimum wage requirements (H. Rept. No. 309, 88th Cong., 1st Sess., p. 2)." 29 C.F.R. § 800.5. The intent of Congress when it enacted the EPA as reflected in the legislative history demonstrates that application of FLSA principles when interpreting the EPA is appropriate. The House of Representatives Committee on Education and Labor stated in its report on the EPA that the Act merely enlarged the existing provisions of the FLSA to include among its other protections, equal payment of wages regardless of sex.[4] In the Senate, the remarks of

---

4. In the "Purpose and Summary of Major Provisions" of the Equal Pay Act, the House Report made clear that a violation of the EPA would also violate FLSA and thus equal payment of wages was now an additional fair labor standard. The report stated as follows:

[The Equal Pay Act] amends the Fair Labor Standards Act to provide that payment of a

discriminatory wage rate, where the discrimination is based on sex of the employee, shall in the future be a violation of the Fair Labor Standards Act.

The Fair Labor Standards Act provides that workers must be paid a decent minimum wage, that if employees must put in long hours, they must be paid at an overtime rate,

Senator McNamara on the floor of the Senate further exemplify the intent of Congress to incorporate the Equal Pay Act into the FLSA. The Senator stated in reference to the Equal Pay Act that:

> [The Act] provides for a simple and straightforward amendment of the Fair Labor Standards Act of 1938. [It] establishes an additional protection that a worker cannot be paid a discriminatory wage rate because of his or her sex. First, there will be no change or expansion of present labor standards application.
>
> Those employers who are presently subject to the Fair Labor Standards Act will be the only ones subject to the new provisions on equal pay.

109 Cong.Rec. at 8914. Based on the agency rules and interpretations and the legislative history reviewed, this Court concludes that it is consistent with the letter and spirit of the intent of Congress when it enacted the Equal Pay Act to refer to rules of statutory interpretation involving the FLSA to decide the scope of the Equal Pay Act.

### B.

Congress found in 1938 labor conditions adverse to this nation's economic and social development. The Fair Labor Standards Act was enacted by Congress to correct "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers". 29 U.S.C. § 202(a). Consequently, the primary purpose and intent of Congress when it enacted the FLSA was to achieve a humanitarian and remedial purpose. *Tennessee Coal Co. v. Muscoda Local,* 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1944); *Department of Labor v. Ellege,* 614 F.2d 247, 251 (10th Cir.1980); *Dunlop v. Carriage Carpet Co.,* 548 F.2d 139, 143 (6th Cir.1977). In construing the FLSA in *Tennessee Coal Co. v. Muscoda Local,* the United States Supreme Court set forth the pertinent rule of statutory interpretation for the Act. The Court noted that the provisions of

> "the Fair Labor Standards Act are remedial and humanitarian in purpose. We are not dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others. Those are the rights that Congress has specially legislated to protect. *Such a statute must not be interpreted or applied in a narrow, grudging manner."* 321 U.S. at 597, 64 S.Ct. at 702. (emphasis added).

Clearly, the Supreme Court has applied to the FLSA a special statutory interpretation consistent with the purpose of the Act.

To effectuate the remedial and humanitarian purposes of the FLSA, the courts have liberally construed the Act "to apply to the furthest reaches consistent with congressional direction." *Mitchell v. Lubin McGaughy & Associates,* 358 U.S. 207, 211, 79 S.Ct. 260, 263, 3 L.Ed.2d 243 (1959). When determining the scope of the FLSA "breadth of coverage is vital to [the Act's] mission." *Powell v. United States Car-*

and that children may be employed only under rigid conditions which protect their health and safety.

[The Equal Pay Act] would add one additional fair labor standard to the [FLSA]; namely, that employees doing equal work should be paid equal wages, regardless of sex.

Because of the long history and experience of Government and business and workers with the Fair Labor Standards Act, a simple expansion of that act to include the equal pay concept offers the most efficient and least difficult course of action.

H.R.Rep. No. 309, 88th Cong., 1st Sess., *reprinted in* [1963] U.S.Code Cong. & Ad.News, 687, 688. *See also* 109 Cong.Rec. 9195 (1963) (debate on the floor of the House of Representatives). The supplemental views expressed in the House Report also clearly reflect the intent of Congress that the standards developed under the FLSA also apply when dealing with the Equal Pay Act. The supplemental views indicate that

"The definitions and interpretations of the Fair Labor Standards Act apply. These have been court tested and are generally understood by business and labor." [1963] U.S. Code Cong. & Ad.News at 690.

Thus, it is abundantly clear that the intent of Congress when enacting the Equal Pay Act was to carry forward the principles already created under the FLSA.

*tridge Co.,* 339 U.S. 497, 516, 70 S.Ct. 755, 765, 94 L.Ed. 1017 (1950). In particular, the Sixth Circuit has noted that the definitions of the FLSA, 29 U.S.C. § 203, must be construed liberally to effectuate the broad policies and intentions of Congress. *Dunlop v. Carriage Carpet Co.,* 548 F.2d 139, 143 (6th Cir.1977). *See also* 29 C.F.R. 779.101 (1981). Understandably, a liberal and broad reading of the coverage of the FLSA also means that exemptions from the Act are to be narrowly construed. The United States Department of Labor regulations state that:

> An employer who claims an exemption under the Act has the burden of showing that it applies. (*Walling v. General Industries Co.,* 330 U.S. 545 [67 S.Ct. 883, 91 L.Ed. 1088]; *Mitchell v. Kentucky Finance Co.,* 359 U.S. 290 [79 S.Ct. 756, 3 L.Ed.2d 815]; *Fleming v. Hawkeye Pearl Button Co,* 113 F.2d 52.) Conditions specified in the language of the Act are "explicit prerequisites to exemption." (*Arnold v. Kanowsky,* 361 U.S. 388 [80 S.Ct. 453, 4 L.Ed.2d 393].) "The details with which the exemptions in this Act have been made preclude their enlargement by implication." (*Addison v. Holly Hill,* 322 U.S. 60 [607, 64 S.Ct. 1215, 88 L.Ed. 1488]; *Maneja v. Waialua,* 349 U.S. 254 [75 S.Ct. 719, 99 L.Ed. 1040].) Exemptions provided in the Act "are to be narrowly construed against the employer seeking to assert them" and their application limited to those who come plainly and unmistakably within their terms and spirit; this restricted or narrow construction of the exemptions is necessary to carry out the broad objectives for which the Act was passed. (*Phillips v. Walling,* 324 U.S. 490 [65 S.Ct. 807, 89 L.Ed. 1095]; *Mitchell v. Kentucky Finance Co., supra, Calaf v. Gonzalez,* 127 F.2d 934 [1st Cir.]; *Bowie v. Gonzalez,* 117 F.2d 11 [1st Cir.]; *Mitchell v. Stinson,* 217 F.2d 210 [1st Cir.]; *Fleming v. Hawkeye Pearl Button Co.,* 113 F.2d 52 [8th Cir.].)

29 C.F.R. § 779.101 (1981). Thus, the remedial and humanitarian purposes of the FLSA are the touchstone for application of and statutory interpretation of its coverage and that of the Equal Pay Act.

### III.

Against this backdrop of legislative, administrative and judicial interpretations of the Fair Labor Standards Act, the Court must determine whether the Equal Pay Act applies to Belmont College. This Court believes that the proper approach is to first determine whether Belmont College is an "employer" under the Equal Pay Act as that term is defined in the Fair Labor Standards Act, 29 U.S.C. § 203(d). Second, if Belmont College is an "employer", then the Court must determine whether it is constitutional to apply the Equal Pay Act to Belmont College, a church-controlled educational institution. This approach is consistent with that in *Catholic Bishop* when the Supreme Court determined whether the National Labor Relations Act applies to lay teachers at church-related schools and, if it does apply, whether it can withstand constitutional analysis under the First Amendment. *Catholic Bishop,* 440 U.S. at 491, 99 S.Ct. at 1314. This case is unlike *Catholic Bishop* because a broad interpretation of the terms of the EPA and FLSA includes the parties in this case and the narrow constitutional question at issue.

### A.

The Equal Pay Act of 1963 provides in part:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions....

29 U.S.C. § 206(d). The Equal Pay Act subjects all "employers" to its requirements. An "employer" is defined under the Fair Labor Standards Act, 29 U.S.C. § 203(d) as,

any person acting directly or indirectly in the interest of an employer in relation to an employee...

An "employee" is defined as "any individual employed by an employer", 29 U.S.C. § 203(e)(1), with certain exemptions. 29 U.S.C. § 203(e)(2) and (3) and 29 U.S.C. § 213.[5] The terms "employer" and "employee" must be interpreted broadly and expansively to accomplish the remedial purposes of the FLSA and its amendment of the Equal Pay Act. *See, e.g., Real v. Strawberry Associates, Inc.,* 603 F.2d 748 (9th Cir.1979) and *Yellow Cab Co. of D.C. v. Magruder,* 49 F.Supp. 605 (D.Md.1943), *aff'd,* 141 F.2d 324 (4th Cir.1944). The Supreme Court has applied an economic reality test to determine whether an employer-employee relationship exists, emphasizing a person's economic dependence on his employer, *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961); *Dunlop v. Dr. Pepper-Pepsi Cola Bottling Co.,* 529 F.2d 298, 300 (6th Cir.1976), when assessing the total relationship of the parties. *Dunlop,* 529 F.2d at 301.

It is undisputed that Dr. Russell was employed by Belmont College pursuant to a "Faculty Contract" for the 1979–80 school year which provided her a salary of $13,200, *Affidavit of R. Kreis White, Attachment D,* for her employment with Belmont on a full-time basis. In the judgment of this Court, Belmont College is an "employer" within the meaning of 29 U.S.C. §§ 203(d) and 206(d)(1), because the Tennessee Baptist Convention assigns as one of the functions of Belmont College that of providing professional faculty to accomplish Belmont's purposes. Thus, Belmont College has central control over all personnel. *Affidavit of James P. Gunther, Attachment G. Marshall v. Georgia Southwestern College,* 489 F.Supp. 1322, 1329 (M.D.Ga.1980). This Court is also of the opinion that Belmont College is an enterprise engaged in commerce within the meaning of 29 U.S.C. § 203(s)(5).[6] *See also Brennan v. Goose Creek Consolidated Independent School District,* 519 F.2d 53, 56 (5th Cir.1975). *Cf.*

---

**5.** One of the exemptions from the definition of an "employee" as provided in the FLSA is for employees "in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1), which includes college teachers such as Dr. Russell. 29 C.F.R. § 541.215. This exemption, however, does not apply to the Equal Pay Act according to the 1972 amendments of the FLSA. P.L. 92–318, 86 Stat. 235, amending 29 U.S.C. § 213(a). *See also* C. Sullivan, M. Zimmer, & R. Richards, *Federal Statutory Law of Employment Discrimination,* 589 (1980) (citing *Brennan v. Woodbridge School Dist.,* 8 EPD ¶ 9640 (D.Del.1976)). By express Congressional direction employees in a bonafide executive, administrative or professional capacity are specifically included in the definition of employees for purposes of the EPA but not for purposes of the FLSA. Consequently, the express intent of Congress in enacting the EPA was to include college teachers within the coverage of the Act. Application of the *Catholic Bishop* test may exempt college teachers in church-controlled colleges from the EPA. Not only would this result be contrary to a broad reading of the FLSA and the EPA required by prior judicial precedents but would accomplish by judicial fiat what Congress has specifically rejected.

**6.** Institutions of higher education such as Belmont College are specifically included in the definition of an "enterprise engaged in commerce or in the production of goods for commerce," 29 U.S.C. § 203(s)(5). That section provides:

(s) "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise which has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and which—

\* \* \* \* \* \*

(5) is engaged in the operation of ... *an institution of higher education* (regardless of whether or not such ... institution, or school is public or private or operated for profit or not for profit). (emphasis added).

This specific inclusion of colleges and universities within the meaning of enterprise engaged in commerce, bolsters the Court's conclusion to not apply the *Catholic Bishop* test which may exempt Belmont College from the coverage of the FLSA and EPA and do violence to judicial interpretations requiring a broad and flexible interpretation of the Act. *See generally* Player, "Enterprise Coverage Under the Fair Labor Standards Act: An Assessment of the First Generation," 28 *Vand.L.Rev.* 283, 329–30 (1975).

*Marshall v. Dallas Independent School District,* 605 F.2d 191 (5th Cir.1979). Thus, the Court concludes that Belmont College is an "employer" and Dr. Russell is an "employee" within the meaning of the Fair Labor Standards Act and its amendment the Equal Pay Act.

### B.

Having determined that Belmont College is subject to the EPA, the Court must now determine whether application of the Act to Belmont College can withstand constitutional analysis under the religious clauses of the First Amendment.[7] The constitutional issue presented, as previously stated, is extremely narrow: whether the First Amendment permits a church-controlled educational institution, such as Belmont College, having employed a lay female teacher to discriminatorily compensate its employees on the basis of sex. Belmont College asserts an exception from the Equal Pay Act because of the free exercise and establishment clauses of the First Amendment, although it does not set forth any supporting reasons. *See Plaintiff's Memorandum of Law In Support of Motion for Summary Judgment* at 3.

In reviewing the constitutional questions presented, the Court is mindful that:

"The issues of accomodating religious beliefs and the proper relationship between the free-exercise and establishment clauses are squarely presented when religious organizations claim exemption from anti-discrimination laws. For example, a religious organization may assert that separation of the races is a central tenet of its faith, so that its free exercise of religion will be inhibited unless it is permitted to practice otherwise illegal discrimination. This claim may meet the counter argument that to excuse the organization from the law is to accord it preferential treatment that is, in effect, an establishment of religion."

Bagni, "Discrimination in the Name of the Lord: A Critical Evaluation of Discrimina-tion by Religious Organizations," 79 *Columbia L.Rev.* 1514, 1515 (1979). In the present case, Belmont College has not asserted the potentially troublesome argument that it is a central tenet of the Baptist faith to compensate its employees discriminatorily because of their sex. Moreover, the documents submitted by Belmont College in no way suggests that it is a sincerely held belief of the Baptist faith to discriminate on the basis of sex in the compensation of its employees. Absent such express assertions by Belmont College, this Court will not imply them. Thus, this Court concludes after applying settled First Amendment analysis that it does not violate the Constitution to apply the Equal Pay Act to Belmont College.

The free exercise clause prohibits legislation of religious beliefs. To determine whether a statute violates the free exercise clause courts have applied a three-part analysis: (1) the magnitude of or the impact of the statute upon the exercise of the religious belief; (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief; and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state. *EEOC v. Mississippi College,* 626 F.2d 477, 488 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981), *citing Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). *See also EEOC v. Pacific Press Publishing Association,* 676 F.2d 1272, 1279 (9th Cir. 1982).

The Court finds that requiring Belmont College to comply with the EPA does not infringe free exercise of its religious beliefs. In assessing the impact of the Equal Pay Act on Belmont College, the relevant inquiry is "the impact of the statute upon the institution's exercise of its sincerely held religious beliefs." *EEOC v.*

---

**7.** The religion clauses of the First Amendment provide: "Congress shall make no law respect-ing an establishment of religion, or prohibiting the free exercise thereof".

*Mississippi College,* 626 F.2d at 488. As pointed out above, Belmont College asserts a blanket First Amendment exemption specifying no reasons for its exemption as it relates to the Baptist faith. Nor does this Court divine any reason that exercise of Belmont's religious belief will be threatened or hampered if required to pay its employees doing equal work equal pay regardless of sex. Moreover, this nation has a strong public policy against discrimination not only on the basis of sex but in all forms.[8] The Equal Pay Act of 1963 reflects our national commitment to end that form of unequal pay discrimination based on one's gender. Senator McNamara stated it well.

> [The Equal Pay Act] establishes a most worthy national policy—that an individual who does equal work should be rewarded with equal compensation regardless of his or her sex.

Thus, this Court finds that the government has a compelling interest to justify a burden, in this case minimum at best, to impose on Belmont College's exercise of religious beliefs the demands of the Equal Pay Act.

This Court recognizes that when dealing with the FLSA exemptions are to be narrowly construed. Belmont College has presented no argument for its exemption from the Equal Pay Act aside from the *Catholic Bishop* test which this Court has found not applicable. An exemption of Belmont College from the Equal Pay Act is simply not justified given that little, if any, burden will be imposed on her exercise of religious beliefs and given this Nation's strong commitment against sex discrimination. Thus, the Court concludes that application of the Equal Pay Act to church-controlled educational institutions, such as Belmont College, which employ females in lay positions, does not violate the free exercise

clause of the First Amendment. *Accord Marshall v. Pacific Union Conference of Seventh-Day Adventists,* [1977] Emp.Prac. Dec. (CCH) 7806 (C.D.Cal.1977) (Equal Pay Act); *Mitchell v. Pilgrim Holiness Church Corp.,* 210 F.2d 879 (7th Cir.), *cert. denied,* 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136 (1954) (minimum wage). *Cf. EEOC v. Pacific Press Publishing Association,* 676 F.2d 1272, 1282 (9th Cir.1982) (Title VII).

Neither does the establishment clause of the First Amendment prohibit application of the Equal Pay Act to Belmont College. To withstand scrutiny under the establishment clause, the statute: (1) must have a secular purpose; (2) must neither advance nor inhibit religion as its primary affect; and (3) must not foster excessive government entanglement with religion. *EEOC v. Mississippi College,* 626 F.2d 477, 486 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981) (citing *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971)); *Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 654, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980); *Roemer v. Maryland Public Works Bd.,* 426 U.S. 736, 748, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976). Again, Belmont College asserts no specific reason to accord it a First Amendment exemption, except for its belief that *Catholic Bishop* prevents application of the Equal Pay Act to it. For present purposes, this Court finds no constitutional violation. First, the Equal Pay Act has a secular purpose it simply requires equal pay for equal work. Second, the Act clearly does not have the effect of advancing or inhibiting religion. Third, the Act does not foster any excessive government entanglement. In determining whether government

---

**8.** Mr. Justice Blackmun observed in *Rose v. Mitchell,* 443 U.S. 545, 558–59, 99 S.Ct. 2993, 3001, 61 L.Ed.2d 739 (1979) that:

> [R]acial and other forms of discrimination still remain a fact of life ... in our society as a whole. Perhaps today that discrimination takes a form more subtle than before. But it is not less real or pernicious.

Additionally, Judge Lively of the Sixth Circuit Court of Appeals opined in *Detroit Police Officers' Association v. Young,* 608 F.2d 671, 697 (6th Cir.1979) that "[w]hen claims are brought by members of a group ... subjected to discrimination the case moves with the grain of the Constitution and National policy". The Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964 combine to erase sex discrimination in employment and the terms of employment and close a sorry chapter in this nation's history.

entanglement is excessive, this Court must examine,

the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority.

*Lemon v. Kurtzman,* 403 U.S. 602, 614–15, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971) relied on by the court in *EEOC v. Mississippi College,* 626 F.2d at 486. Belmont College is strikingly similar to Mississippi College at issue in *EEOC v. Mississippi College.* As in that case, Belmont College is "pervasively sectarian. The purpose of the College is to provide a college education in an atmosphere saturated with Christian ideals. The College is formally affiliated with the [Tennessee] Baptist Convention. Indeed, the College exists primarily to serve the evangelical mission of the Convention. The Convention selects the Board of Trustees that exercises effective control over the College." *Id.* at 487. This description of Mississippi College mirrors that of Belmont College. *See Affidavit of James P. Guenther, Attachments A and G.* Moreover, no relationship is created between Belmont and the federal government until Belmont College violates or is alleged to have violated the Act. Then Belmont College is subject only to limited investigation and de novo judicial determination. While this may impose some minimum burden on Belmont, the resulting limited relationship created with the federal government leads this Court to conclude, as did the Fifth Circuit in *Mississippi College,* when interpreting Title VII, that application of the EPA to Belmont College will not "foster excessive government entanglement with religion." *Id.* at 488. Thus, this Court concludes that application of the EPA to Belmont College will not violate the establishment clause of the First Amendment. *Accord Marshall v. Pacific Union Conference of Seventh-day Adventists; Mitchell v. Pilgrim Holiness Church Corp.; EEOC v. Pacific Press Publishing Association.*

## IV.

The defendants also attack the timeliness of Dr. Russell's charge of unlawful sex discrimination filed with the Equal Employment Opportunity Commission (EEOC) on October 22, 1980. In her charge of sex discrimination by Belmont College, Dr. Russell complains of discriminatory discharge from Belmont College and discrimination in the terms, conditions, privileges and compensation of her employment with Belmont College. The defendants maintain that Dr. Russell's EEOC charge is barred because 42 U.S.C. § 2000e–5(e) requires charges under Title VII to be filed 180 days after the alleged unlawful employment practice occurred. Thus, the defendants argue that the plaintiff can have no cause of action for unlawful employment discrimination before April 25, 1980 which is 180 days before October 22, 1980.

Section 706(e) of Title VII, 42 U.S.C. § 2000e–5(e), provides in relevant part:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, *except* that in the case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a state or local agency . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings . . . (emphasis added).

Clearly this section requires a timely charge of unlawful discrimination to be filed with the EEOC within 180 days "after the alleged unlawful practice occurred." The section, however, creates an exception when an employee is required to first file with a state or local antidiscrimination agency; then the employee may timely file his charge with the EEOC within 300 days of the alleged violation or 30 days after the

state or local agency has terminated its proceedings. *See* C. Sullivan, M. Zimmer, and R. Richards, Federal Statutory Law of Employment Discrimination 271–76 (1980).

Tennessee is known as a deferral state because it has established a qualified state agency to handle discrimination claims, namely the Tennessee Human Development Commission, Tenn. Code Ann. §§ 4–21–101, *et seq.* This agency allows employees to file their charges of alleged discrimination with the Commission and later file with the EEOC. An employee who files with the Tennessee Human Development Commission may enjoy the 300/30 day time periods to file an EEOC charge.

In this case, Belmont College gave Dr. Russell final notice of its intent not to contract with her for the next school year on January 16, 1980.[9] *Defendants' Supplemental Memorandum of Law in Support of Motion for Summary Judgment* at 2. Ap-

plying the 180-day period in § 2000e–5(e), the defendants contend that the plaintiff's EEOC charge filed on October 22, 1980 was untimely, it being more than 180 days after the decision to terminate on January 16, 1980.[10] The analysis does not stop here, however, as the defendants contend, the Court must also determine whether the 300-day period applies. If the 300-day period applies, then Dr. Russell's October 22, 1980 EEOC charge being within 300 days of the January 16, 1980 decision to terminate is timely.

The 300-day period is triggered when the employee initiates a charge of unlawful employment discrimination with a state agency or when the EEOC refers the charge on behalf of an employee to the appropriate state agency. As the Supreme Court explained in *Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), in

---

**9.** It is not clear whether the defendants also argue that because the plaintiff was employed under a one-year contract with no intent to continue beyond one year, that the plaintiff was effectively hired on and the decision to terminate made on August 15, 1979. *Defendants' Memorandum & Law in Support of Motion for Summary Judgment* at 6. This would mean that the plaintiff had 180 days in which to bring a charge of unlawful discrimination from the date of her employment. Thus, in this case, Dr. Russell would have had to decide 180 days after accepting the contract with Belmont College to file an EEOC claim. The defendants cite no legal authority for such a requirement because such a requirement is plainly without merit.

The relevance of the plaintiff's one-year contract with Belmont College may be to establish a "legitimate non-discriminatory reason" for the plaintiff's discharge. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The order and allocation of the burdens of proof in a disparate treatment case was announced in *McDonnell Douglas Corp. v. Green* and refined in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In a disparate treatment case, the burden is on the plaintiff to prove a prima facie case of unlawful discrimination, then the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" after which the plaintiff has another opportunity to prove that the legitimate nondiscriminatory reason is a pretext for unlawful discrimination. *Id.* at 253, 101 S.Ct. at 1093. The defendants may contend that Dr. Russell

was discharged not because of her sex but because she was employed pursuant to a one-year contract. Of course, Dr. Russell may still succeed if she can prove, as she alleges, that the defendants entered the one year contract with no intent to renew because of her sex.

It is clear at this point that the one-year contract is not relevant in determining whether the plaintiff's EEOC charge was timely filed.

**10.** The Court observes that it is uncontroverted that Dr. Russell filed an EEOC claim against Belmont College in May 1980 which was returned to her by the EEOC. *Attachment # 5, Plaintiff's Memorandum of Fact and Law.* Had this May 1980 claim been properly lodged with the EEOC, it would have been within the 180-day period of the defendant's decision to terminate Dr. Russell on January 16, 1980 and, therefore, timely filed. It is not clear whether the EEOC unilaterally returned Dr. Russell's claim or if she requested her claim be returned. If the former, then this Court would seriously question the EEOC's authority to return a properly filed claim of discrimination to a petitioner. Moreover, if the EEOC unilaterally returned Dr. Russell's claim, then this Court would consider the May 1980 claim for purposes of determining the timeliness of Dr. Russell's EEOC claim. If Dr. Russell requested the EEOC to return her May 1980 claim, then the Court would consider only the subsequently filed October 1980 EEOC claim for timeliness purposes. In any case, summary judgment would not be appropriate on this point given the uncertainty of the record now before the Court.

which the aggrieved employee submitted a letter to the EEOC without instituting any state proceedings, the 300-day period exception to the 180-day period may still be applicable. Justice Stevens wrote for the majority in *Mohasco* that:

> Under the literal terms of the statute, it could therefore be argued that he did not bring himself within the exception to the general 180-day requirement. But in *Love v. Pullman Co.,* 404 U.S. 522, 525, 92 S.Ct. 616, 618, 30 L.Ed.2d 679, we held that "[n]othing in the Act suggests that the state proceedings may not be initiated by the EEOC acting on behalf of the complainant rather than by the complainant himself . . . ." Here, state proceedings were instituted by the EEOC when it immediately forwarded his letter to the state agency . . . Accordingly, we treat the state proceedings as having been instituted on that date. Since the EEOC could not proceed until either state proceedings had ended or 60 days had passed, the proceedings were "initially instituted with a State . . . agency" prior to their official institution with the EEOC. Therefore, respondent came . within § 706(e)'s [300-day period] exception . . .

*Id.* at 816–17, 100 S.Ct. at 2492 [11].

■ To determine whether an EEOC charge is timely under the 300-day period, the Supreme Court adopted the following approach in *Mohasco.*

> [A] complainant in a deferral State . . . need only file his charge within 240 days of the alleged discriminatory employment

in order to insure that his federal rights will be preserved. If a complainant files later than that (but not more than 300 days after the practice complained of), his right to seek relief under Title VII will nonetheless be preserved if the State happens to complete its consideration of the charge prior to the end of the 300-day period.

*Id.* at 814 n. 16, 100 S.Ct. at 2491 n. 16. Thus, the plaintiff has 300 days in which to file a timely EEOC charge in a deferral state such as Tennessee. *Accord Jones v. AIRCO Carbide Chemical Co.,* 691 F.2d 1200, 1203 (6th Cir. 1982).

■ It is uncontroverted in the present case that Dr. Russell filed an EEOC charge on October 22, 1980 which was referred by the EEOC to the state agency on October 23, 1980 and returned by the state agency to the EEOC on October 30, 1982. *Plaintiff's Memorandum of Fact and Law* at 12; *Defendant's Memorandum of Law in Support of Motion for Summary Judgment* at 2. Thus, the 300-day period was triggered by the EEOC on October 23, 1980 when it referred Dr. Russell's charge to the state agency.[12] The state agency terminated its proceedings and returned Dr. Russell's charge to the EEOC on October 30, 1980, making that date the EEOC filing date. Since October 30, 1980 is within 300 days of the January 16, 1980 decision to terminate Dr. Russell, her EEOC charge was timely filed. Therefore, having filed within 300 days of the alleged unlawful employment

---

**11.** The holding in *Mohasco* applies prospectively from June 23, 1980. *Jones v. AIRCO Carbide Chemical Co.,* 691 F.2d 1200, 1202 n. 3 (6th Cir.1982); *Hall v. Ledex, Inc.,* 669 F.2d 397, 399 (6th Cir.1982). Dr. Russell's EEOC claim was filed in October 1980 so the *Mohasco* case does apply.

**12.** Tennessee has a 180-day period for a complainant to file a charge of unlawful employment practice with the state agency "after the commission of the alleged discriminatory practice." T.C.A. § 4–21–115(a). Dr. Russell's charge of alleged discrimination was filed on October 23, 1980 by the EEOC on her behalf. Because October 23, 1980 is more than 180 days after the decision to terminate Dr. Russell on January 23, 1980, the issue arises: whether

Dr. Russell's failure to comply with the state requirement of 180 days to file a charge with the state agency precludes review by this Court of the Title VII claim. Fortunately, this issue was recently addressed by the Sixth Circuit in *Jones v. AIRCO Carbide Chemical Co.,* 691 F.2d 1200 (6th Cir.1982). In *Jones,* the Court held that a complainant is not required to file with a state agency within 180 days even if required by state statute and that compliance with a state statute is irrelevant for determining whether a complainant has 180 days or 300 days to file with the EEOC. Thus, it is not relevant that the EEOC filed with the state agency on Dr. Russell's behalf more than 180 days after the alleged discriminatory practice occurred.

action, Dr. Russell comes within the exception to the 180-day period to file an EEOC charge of discriminatory discharge.

Dr. Russell's charge of discrimination by Belmont College complains not only of discriminatory discharge but also of discrimination in the compensation of her employment with Belmont College. This charge overlaps with her Equal Pay Act claim. The timeliness of Dr. Russell's discriminatory pay claim is subject to the "continuing violation" doctrine. The Sixth Circuit held in *Hall v. Ledex, Inc.*, 669 F.2d 397, 398 (6th Cir.1982), that a discriminatory denial of equal pay is "continuing in nature" and subjects a complainant to the impact of discrimination with each check received. *Id. See also United Air Line, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Thus, in this case, Dr. Russell was subjected to discrimination in her compensation from Belmont College until her termination in May 1980. Dr. Russell's October 30, 1980 EEOC charge is clearly within 300 days of the plaintiff's termination in May 1980; thus, she has a timely Title VII compensation claim for discrimination on the basis of sex.

## V.

■ The defendants also seek summary judgment on some of the plaintiff's pendent state law claims, namely: breach of contract, interference with prospective employment, negligence, and defamation. The burden on the plaintiff when the defendant moves for summary judgment is not to show that a claim has been stated, but to show that there is a disputed issue of material fact. Fed.R.Civ.P. 56(e) provides in part that:

> When a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of his pleading but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Relying on depositions, the defendants correctly argue that the plaintiff has failed to show essential elements of her pendent state law claims. The plaintiff has failed to establish either in her brief or during the hearing on this motion that disputed issues of material fact exists on the state law claims. Without countervailing affidavits, the Court must grant summary judgment in favor of the defendants on the plaintiff's state law claims of breach of contract, interference with employment contract, interference with prospective employment and negligence.

■ As to the plaintiff's claim of defamation by libel, the defendants argue that any libelous statements occurred more than six months after the statements were made. Recognizing that Tennessee has a six months statute of limitation for defamation, Tenn.Code Ann. § 28–3–103, the defendants urge summary judgment in their favor on this claim. Again, the plaintiff has completely failed to show any dispute on the defendants' factual assertion that the defamatory statements occurred more than six months before suit. The Court finds the defendants' factual assertion undisputed and grants summary judgment on this claim.

## VI.

In summary, the Court concludes that: (1) Belmont College is subject to the Equal Pay Act and that it does not violate the religion clauses of the First Amendment of the United States Constitution to subject Belmont College to the Equal Pay Act; (2) Dr. Russell timely filed her Title VII claim of unlawful discrimination by Belmont College with the EEOC; (3) Dr. Russell has failed to show a disputed issue of material fact on some of her state pendent claims. Accordingly, an ORDER will enter granting the defendants' motion on the plaintiff's pendent state law claims—breach of contract, interference with employment contract, interference with prospective employment, defamation and negligence—and denying the defendants' motion on the plaintiff's Equal Pay Act and Title VII claims.